## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:21-cr-60** |
| **Plaintiff,** | |
| | **JUDGE SARGUS** |
| **vs.** | |
| **JAMES DAVID HAMPTON** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **Defendant.** | |

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Defendant James David Hampton ("Defendant" or Hampton"). For the reasons set forth herein, and pursuant to the Rule 11(c)(1)(A) Plea Agreement filed in this case, the United States recommends that Defendant be sentenced to a term of 36 months of imprisonment, followed by a three-year term of supervised release to include all treatment as recommended by the probation officer and the electronic monitoring of his online activity, and a $400 mandatory special assessment.

### I.      Factual Background

On August 26, 2020, an individual, identified as J.P., called the FBI National Threat Operations Center (NTOC) and reported that the defendant made threats on Facebook to kill J.P. and others who were members of the Abortion Support Network ("ASN") Facebook group. ASN is a non-profit abortion support organization based in the United Kingdom whose mission was to help people access safe abortions. ASN maintained a Facebook page which clearly identified their mission. The FBI discovered that Hampton searched for abortion support groups on Facebook and found ASN. He then electronically transmitted messages that threatened injury or death to multiple

individuals he identified on the ASN Facebook page.  Mr. Hampton transmitted three separate threats to Facebook users J.P. and D.D. and two separate threats to Facebook user A.S. for a total of eight threats in just the counts of conviction.  For example, to all three of the identified victims above, he wrote: `Enny minny miny moe ( did I spell that correctly ? ) .. which one of you will I choose first ?..[identifying victims] 😖... I wonder, could I snatch all of them and force them to savagely beat each other to death ?.. ( probably not in the first few days) .. but, call me arrogant, but I believe I could achieve this within a week !..

In addition to the electronic communications, Hampton posted several public Facebook live videos to his profile on August 26, 2020.  In the videos, Hampton explained that he had killed pro-abortion supporters in the past and would do so again.  Hampton is clearly identified in the videos and stated, "My name is James David Hampton and I kill baby murderers."  He went on to say that his, "great satisfaction in life is hunting them and stalking them and killing them."  Further, Hampton stated, "the same lack of compassion you have for unborn children will be showed upon you" as well as "there are people like me who hunt people like you" and "individuals like me kill people like them, and we sleep well at night."  Hampton warned that a great and ferocious wrath was coming and spoke about burning down clinics and executing the doctors in the streets, as well as people who fund abortion clinics.

On the same day the threats were made, members of the FBI Joint Terrorism Task Force (JTTF) contacted Hampton's mother who provided an updated address for her son.  Shortly after speaking with the Hampton's mother, Hampton reached out to law enforcement.  He confirmed his residence and admitted to making the online threats.  He disclosed that he logged into Facebook, searched for abortion clinics, and found the chat thread.

During his conversation with law enforcement, Hampton spoke about his anti-abortion ideology and felt that the government supported the death of children.  Hampton was asked if he wanted to go to Buffalo, New York, and kill innocent people at an abortion clinic.  Hampton replied that it would be terrible if innocent people were killed, but no one at the abortion clinics were innocent.  He went on to say that he had been quiet for years and decided to come out of hiding and be that one person.  Hampton denied having a plan to shoot up an abortion clinic but stated that he would rather burn the clinics down so it would be more difficult to repair the structure of the building.

On August 27, 2020, a consensual interview was conducted with Hampton in London, Ohio, where he again admitted to logging into Facebook and searching for abortion related sites. He stated that he planned on writing about how he believed abortion was not moral, but saw a cartoon depicting an aborted baby.  He then sought out individuals on the page and began giving explicit details on how he would abort each one of them.  Hampton mentioned tagging the individuals and giving them choices.  One person posted their name and place of employment on Facebook.  Hampton proceeded to tell the individual how he would initiate surveillance, identify, and follow him home.  He then stated he would enter their home and give a variety of choices to choose from on how he would abort the person.

Additionally, Hampton mentioned that he did not like messes and would use a 7.62 caliber weapon from 800 yards away.  He wanted the abortion supporters to feel hunted and stated there were people who kill pro-abortion supporters.  He compared individuals who work in abortion clinics to hyenas and commented that although they cannot be cured, there still must be a cure. Hampton denied participating in anti-abortion activism as he did not think waving signs and

shaming people effectively combated abortion, but rather you must combat a genocide of unborn babies with combat. He added that he hoped someone would reach out and ask him to explain more of his ideologies. He stated shooting up abortion clinics would draw attention and reduce his reaction time. He commented that a guerilla person does not need training and if time was spent planning, getting the layout and knowledge about what was inside then homemade napalm, canisters, and a timing device could be used. Hampton referred to the government as the Roman Caesar and expressed discontent with how the Republic and the sick liberal agenda had infiltrated the minds of the weak. He disclosed that when he was 16 years old, he got a woman pregnant who later had an abortion, which upset him.

Hampton consented for the FBI to conduct a cellular phone extraction during the interview. In one video from the Hampton's phone, he is seen sitting in a vehicle with a Springfield XD handgun on his leg. The location of the video is unknown.

## II.    Procedural History

On April 15, 2021, a Grand Jury for the Southern District of Ohio indicted Defendant with ten counts of Transmitting a Threat in Interstate Commerce, in violation of 18 U.S.C. § 875(c). On June 1, 2021, Hampton entered pleas of guilty to Counts 5, 7, 8, and 10 of the Indictment, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.

## III.    Sentencing Guidelines Calculation

### a.   Statutory Maximum Sentence

The maximum sentence for transmitting a threat in interstate commerce is five years imprisonment, a $250,000 fine, a three-year period of supervised release, and a $100 special assessment.

4

b.  <u>Sentencing Guidelines Calculation and Defendant's Objections</u>

In imposing sentence, the Court must take into account the considerations of sentencing set forth in 18 U.S.C. § 3553(a).  *United States v. Booker*, 543 U.S. 220, 261 (2005).  First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  As the Presentence Investigation Report ("PSR") correctly calculates, the combined adjusted offense level, after considering all counts of conviction, is **17**.  The PSR does not award Defendant a **3**-level reduction for acceptance of responsibility.  This is the basis for Defendant's first objection to the PSR; however, the U.S. Attorney's Office agreed in the Plea Agreement, which post-dated the online conduct in October of 2020, that it did not oppose a reduction for acceptance of responsibility and stands by that agreement.

Defendant is a Criminal History Category II, which at offense level **17**, corresponds to a Guideline range of 27–33 months.  With acceptance of responsibility, Defendant's offense level is reduced to **14** and his Guideline range is 18-24 months.

The United States is advocating for an upward departure – as does the PSR.  This is the basis for Defendant's second objection, suggesting that doing so is double dipping given that two-level enhancement for multiple threats contemplated by the guidelines.  The two-level enhancement for multiple threats, however, accounts only for threats made to the same victim.  Here, Hampton engaged in the threatening of multiple victims – some once, some twice, some three times.  Also, the uncharged and dismissed counts of the Indictment, which constitute additional threats, are not accounted for in the guideline calculation.

**IV.     The Proper Sentence**

Once the Court has properly calculated the guideline range, the Court must next consider all the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

  a.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of Defendant's conduct are troubling and heinous – threatening to torture and murder people on Facebook because of their affiliation with an abortion support group.  He went into graphic detail – not only online, but in his interviews with the FBI – about how he would cause pain and suffering to his victims before their death.  Hampton taunted them, with a sense of enjoyment, as to the details of their eventual deaths, telling one victim: "100 beatings with a hot chain ... then ... I will bury you alive in a whole with bleach water to drink ( if you choose to ) .. oh, and the earth above your body will be set on fire as well .. consider it a trial run for your time in hell .."  To another he explicitly stated: I will take great enjoyment in taking your life from you ... `."  Hampton even threatened one victim that he would live stream the

6

victim's death.  Not unlike that live videos Hampton posted to Facebook on the same day explaining his passion for hunting and killing "baby murders" in addition to claiming he had killed pro-abortion supporters in the past and would do it again.  No wonder one victim now finds herself looking over her shoulder and avoiding activities in public alone.  She now carries a knife and pepper spray and enrolled in self-defense classes, anything to help feel safer.  Even in an interview with the FBI Joint Terrorist Task Force the following day, Hampton shamelessly explained how he would go about blowing up an abortion clinic with homemade napalm, cannisters and a timing device.  Add in the mix a video posted by Hampton in which he is seen sitting in a vehicle with a handgun on his leg – a handgun still in his possession at the time of his arrest – and the concern for his dangerousness grows.

Moreover, the Government is not comforted by the statements of those that apparently know Defendant best.  Paster O noted a clear issue with his mental health, which is certainly apparent in the most recent treatment report as detailed in Paragraph 121 of the PSR and indicates that Defendant continues to see violence as the answer.  Paster O further noted that Hampton's angrily and aggressive style of communication is not limited to the online world, but rather has been seen in disagreements with church members, too.  Mr. B conceded that based on his conversations with Defendant that Hampton at least intended to scare his victims; yet seems convinced that Hampton he had no means to carry out the threat.  Perhaps Mr. B wasn't aware of Hampton's possession of a firearm at the time of his arrest.  And Ms. M claimed to have understood what Hampton was attempting to do, as in upholding the teachings of the Bible – and this is the same community that is going to see to it that he stays on the right path moving forward?  Finally, A.M., like others, described Hampton as someone who doesn't understand reality and how to

interact in the real world. A.M. placed Hampton in the category of people who feel as though he is losing "his America" due to the results of the most recent Presidential election, part of the "Older White Men who don't want to let go of what America used to be," and is heavily influenced by the rhetoric he's chosen to believe in. This describes hundreds of others on January 6th, who stormed the U.S. Capitol attempting to overthrow our democracy – something Hampton recently discussed during treatment. None of these "character" witnesses should persuade the Court to give anything less than a significant term of imprisonment.

      b. <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense</u>

The recommended sentence by the government also addresses the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. "Keyboard warrior" is an all too familiar term and attempt to excuse criminal behavior that has real-life consequences for its victims. Hampton made the conscious decision to visit the ASN Facebook page and threaten the lives of pro-choice supporters in a detailed and graphic fashion. The instant offense, alone, demonstrates Hampton's lack of respect for the law and concern for the safety of others when it comes to his personal beliefs and those that disagree. Therefore, the sentence imposed must be significant enough that Hampton realizes the gravity of his actions, that he is not above the law and that his conduct is not without consequences.

      c. <u>The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant</u>

The recommended sentence will also serve the purpose of both general and specific deterrence. Specific deterrence is a chief concern in Hampton's case, where his style of

8

articulating his views seems ingrained and his understanding of the need for counseling questionable. Even after his arrest and knowing that Pretrial Services was monitoring his online activity, Hampton was not deterred from commenting on Facebook, "All these cowards…why isn't there one man to stand up and knock those BLM bastards heads in with a bat?... bunch of cowards just there and ta." A sentence of time-served (approximately six days) will not serve to deter Hampton, nor will it serve to deter others. As defense counsel noted, "all across this country our level of civil discourse and our ability to agree to disagree have all but vanished." Doc. #41, p. 8. Instead, a lengthy term of imprisonment coupled with treatment and the continued monitoring of Hampton's online activity is warranted in this case.

Hampton expressed regret in the engagement and nature of his comments in the PSR, but again, see the treatment report from his counselor for how much remorse he could possibly feel for threatening others given his more recent comments. Hampton further stated in the PSR that his comments were uncharacteristic of his typical behavior – despite others saying that even in face-to-face discourse he is aggressive; and that he has begun attending church again – where his views on abortion are wholeheartedly supported and no one expresses concern about Hampton. Defense counsel advocates for a sentence of time-served because his criminal history is non-violent and to date, Hampton has not acted on any of his graphic depictions of the violence he threatened. Yet, the instant offense needs no precursor as it is born out of a strong hatred for a particular group in which Hampton found threats of violence to be justified. Hampton said it himself, that he had been quiet for years and decided to come out of hiding and be "that one person." Hampton is not just a "keyboard warrior," and this Court's sentence should reflect the egregiousness of his threatening behavior, his commitment to violence as expressed in the

interviews with the FBI and the impact of his actions on his victims. He wanted people to feel hunted, regardless of whether he physically hurt anyone, and his actions did just that – protecting the public from both physical and emotional harm is necessary here.

## V.    Conclusion

For the forgoing reasons, the United States respectfully recommends that the Court sentence Defendant James Hampton to a total term of imprisonment of 36 months, followed by a three-year term of supervised release to include all treatment as recommended by the probation officer and the electronic monitoring of his online activity, and a $400 mandatory special assessment.

Respectfully submitted,

VIPAL J. PATEL
ACTING UNITED STATES ATTORNEY


s/ Jessica W. Knight
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: Jessica.Knight@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's Sentencing Memorandum was served this 21st day of October 2021, electronically on all counsel of record.

s/Jessica W. Knight
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney